NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0495n.06

No. 10-1169

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 18, 2011*

LEONARD GREEN, Clerk

SOLEL UMANI,                                    )
                                               )
    Plaintiff-Appellee,                      )       ON APPEAL FROM THE UNITED
                                               )       STATES DISTRICT COURT FOR THE
v.                                             )       EASTERN DISTRICT OF MICHIGAN
                                               )
MICHIGAN DEPARTMENT OF                          )
CORRECTIONS, et al.,                            )
                                               )
    Defendants,                              )
                                               )
HUGH WOLFENBARGER, Warden, et al.,              )
                                               )
    Defendants-Appellants.                   )

Before:  MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.[*]

PER CURIAM.  This is an appeal from a denial of summary judgment on the issue of

qualified immunity in a prisoner civil rights case.  At all times pertinent to this case, Plaintiff-

Appellee Solel Umani (aka Anthony Bethea) was incarcerated at the Macomb Correctional Facility

("MCF") in New Haven, Michigan.  Umani sued the Michigan Department of Corrections

("MDOC"), MDOC Director Patricia Caruso, and several individual prison employees for alleged

violations of his civil rights pursuant to 42 U.S.C § 1983 and Michigan law, asserting that he was

wrongfully terminated from his position as an assistant lead in the MCF Food Service Department.

---

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern
District of Ohio, sitting by designation.

No. 10-1169
*Umani v. Wolfenbarger, et al.*

Umani's claims against the MDOC were dismissed at the screening stage on the grounds of immunity. All defendants filed a motion for summary judgment on May 25, 2007. In a report and recommendation filed on February 8, 2008, the magistrate judge recommended that Umani's claims for violations of procedural and substantive due process, First Amendment retaliation, and violations of the Eighth Amendment be dismissed, and further recommended the dismissal of all other claims and defendants with the exception of the conspiracy and equal protection claims asserted against Defendants-Appellants Warden Hugh Wolfenbarger, Assistant Deputy Warden Joe Scott, Food Service Director Keith Green and Assistant Food Service Director Connie Ignasiak. These four defendants filed a second motion for summary judgment on April 23, 2009, arguing that Umani had not produced evidence of his equal protection or conspiracy claims, and further arguing that they were entitled to qualified immunity. In a report and recommendation filed on June 16, 2009, the magistrate judge recommended denying the motion for summary judgment on the grounds that Umani had provided sufficient evidence to support a claim for denial of equal protection, on either a race-based or class-of-one theory, as well as a conspiracy claim under 42 U.S.C. § 1985(3).[1] The magistrate judge further concluded that defendants were not entitled to summary judgment on

---

[1]Although Umani did not refer to § 1985(3) in his compliant, it was appropriate for the magistrate judge to analyze his race-based conspiracy claim under that section. A plaintiff is not required to specify a specific statutory provision if the complaint alleges facts upon which relief may be granted under that statute. *See Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005); *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003). The parties did not object in the district court to the application of § 1985(3). *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006)(issues not raised below need not be considered on appeal). In any event, essentially the same analysis is applicable to Umani's conspiracy claim based on race discrimination under either § 1983 or § 1985(3).

qualified immunity grounds. The district court adopted the magistrate judge's recommendation without opinion on July 13, 2009, and denied defendants' motion for reconsideration on February 2, 2010. Wolfenbarger, Scott, Ignasiak and Green then filed the instant appeal.

## I. Background

While incarcerated at MCF, Umani, an African-American male, had a paid work assignment as an assistant lead at MCF Food Service. In his verified complaint filed on February, 13, 2007, Umani alleges that on February 7, 2005, he obtained permission from Food Service Supervisor Robert Al Shareef to leave early. Defendants concede that Umani may have asked permission at some point to leave work early, but assert that he did not follow the complete check-out procedure before leaving. Green later noticed that there was one prisoner working two "slots" and learned that Umani was missing from his post. Shareef told Green that Umani was "in back" but Umani had left the area by that time. Green called the housing unit and instructed Umani to meet him in the Food Service office. Upon being questioned as to why he was not at his post, Umani informed Green that he had received permission to leave early from Shareef. Green told Umani that Shareef denied giving Umani permission to leave. Green then ordered Shareef to issue a "misconduct ticket" to Umani for leaving work without permission. This resulted in Umani being "laid in" or excused from his position until a hearing on the misconduct ticket was held by a resident unit supervisor or assistant resident unit supervisor. Under prison policy, a finding of "guilty" on the misconduct ticket would result in termination of employment, while a finding of "not guilty," absent extenuating circumstances, would generally result in reinstatement with back pay. At the same time that Umani was laid in, Shareef assessed Umani's work performance using a Work Evaluation Form 363 and

gave him an above average score of 37 out of a total possible 39, but noted that Umani had been laid in pending the outcome of his minor misconduct ticket.

On February 11, 2005, an informal hearing on the minor misconduct ticket was held by Assistant Resident Unit Supervisor Wade. Umani alleges that Shareef informed Wade that he had given permission to Umani to leave work early on February 5, 2011, and that he had written the misconduct ticket because he was ordered to do so by Green. No other kitchen staff employees or supervisors were interviewed by Wade. Wade found Umani "not guilty" and ordered him to return to work. Umani returned to work on February 12, 2005. Umani alleges that on February 17, 2005, Scott, who was Wade's supervisor, allegedly scolded Wade for finding Umani "not guilty." Umani also alleges that Green and Ignasiak phoned Wade several times to chide him for finding Umani "not guilty." Wade then called Umani into his office to inform him that despite the finding of "not guilty," it was likely that Umani would be fired from his Food Service position.

On February 18, 2005, Umani allegedly observed Wolfenbarger, Scott, Green and Ignasiak in an office talking for a period of time. At the conclusion of that meeting, Umani was called to Shareef's office. Umani alleges that on his way to the office, he ran into Green, who informed Umani that he had just met with Scott and Wolfenbarger and that it had been decided that Umani should be terminated from his position. According to Umani, when he reminded Green that he had been found "not guilty," Green, who is also an African-American male, stated "That little shit Wade did ain't [sic] working with nothing. Ya'll some worthless convicts. Some niggers that are insignificant in the scheme of things around here." Umani then asked Ignasiak why he had been terminated when Wade had found him "not guilty" of leaving work without permission. Ignasiak

4

allegedly responded, "And we know about ARUS Wade. And we know how you people stick together. Don't worry. The Deps' got his number and so does the Warden." Wade is also an African-American male. Umani further alleged that Ignasiak informed him that she and Green had changed the previous work evaluation from a score of 37 to a far below average score of 1, stating that this was done because he had left work without permission.

In his deposition, Wolfenbarger testified that Ignasiak and Green asked him what alternatives they had to ensure that Umani would be terminated by the Classification Director regardless of the "not guilty" finding, and that he told them that they could give Umani a "bad work report." Scott also testified that he informed Green and Ignasiak that they could file a bad work evaluation with the Classification Director in order to further Umani's termination. There is no evidence or allegation that Scott or Wolfenbarger had any knowledge of Green or Ignasiak's allegedly racist statements. Umani submitted what appears to be an incomplete Form 363 purportedly signed by Green, which gave Umani a score of 1 out of 39 and stated that Umani had "violated the integrity of the job assignment." Complaint, R. 1, Ex. E.

Umani exhausted the grievance process and filed suit in the Michigan Court of Claims. That case was dismissed due to Umani's failure to apprise the court of any previous filings. Umani repeated the grievance process. While the second grievance was pending, Umani was selected to participate in a program that would certify Umani as a drug counselor and guarantee him a four-year scholarship at The Ohio State University. On or about October 4, 2006, Umani was transferred from the MCF to the Riverside Facility. This transfer allegedly resulted in Umani's being ineligible to complete the drug counseling program.

5

## II. Standard of Review

The issue of whether qualified immunity is applicable to an official's conduct is a question of law that this court reviews de novo. *See Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011)(citation omitted). If the legal question is dependent upon which version of facts one believes, then the jury must determine liability. *Champion v. Outlook Nashville, Inc.*, 380 F. 3d 893, 900 (6th Cir. 2004). In order to seek interlocutory review of a decision denying qualified immunity, the defendants may raise only legal issues and must concede Umani's view of the facts. *Shehee v. Lutrell* 199 F.3d 295, 299 (6th Cir. 1999). Thus, if there is a disagreement as to the facts, this court must consider the evidence in the light most favorable to Umani. *Champion*, 380 F.3d at 900. Michigan law also "authorizes an interlocutory appeal from an order denying governmental immunity from suit." *Marvin v. City of Taylor*, 509 F.3d 234, 251 (6th Cir. 2007).

## III. Analysis

### A. Qualified Immunity Factors

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion*, 380 F.3d at 900-901 (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This court evaluates qualified immunity claims using the three-part inquiry set forth in *Feathers v. Aey*, 319 F. 3d 843, 848 (6th Cir. 2003). First, this court must determine whether Umani has alleged facts which, taken in a light most favorable to him, show that the official's conduct violated a constitutionally protected right. If the answer to the first question is "yes," then this court must determine whether

the violated right was "clearly established such that a reasonable official, at the time the act was committed, would have understood that his conduct violated that right." *Id.* Thirdly, if the right was clearly established, we must consider whether Umani has alleged sufficient facts and supported his allegations with sufficient evidence to indicate that what the official did was unreasonable in light of the clearly established constitutional right. *Id.*

This court has discretion to decide which of the prongs of qualified immunity analysis should be addressed first in light of the circumstances. *See Pearson v. Callahan*, 555 U.S. 223, ___, 129 S. Ct. 808, 818 (2009). We begin by addressing whether Umani has alleged facts or produced evidence which, taken in a light most favorable to him, show that the defendants' conduct violated a constitutionally protected right. Because we find that he has not, we need not address the remaining factors, and we conclude that the defendants are entitled to qualified immunity.

## B. Equal Protection Claim

## 1. Nature of Claim

Umani alleges that his rights under the Equal Protection Clause of the United States Constitution and Michigan law were violated by the defendants.[2] To prove a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005)(citing *West v. Atkins*, 487 U.S.

---

[2]The Michigan Supreme Court has held that the rights provided under the Equal Protection Clause of the Michigan Constitution are coextensive with those provided under the United States Constitution. *See Armco Steel Corp. v. Dep't of Treasury, Corp. Franchise Fee Div.*, 358 N.W.2d 839, 842 (Mich. 1984).

42, 48 (1988)). "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). The magistrate judge analyzed Umani's claims under the second and third theories.

## 2. Race-Based Claim

An equal protection claim under the Fourteenth Amendment requires a state actor's intentional discrimination because of the plaintiff's membership in a protected class. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)(purpose of the Equal Protection Clause "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination"). A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973). *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)(discrimination under § 1983 is proved through the *McDonnell Douglas* framework).[3]

We first address whether Umani has alleged facts constituting direct evidence of discrimination. This court has held that "direct evidence of discrimination does not require a fact-

---

[3]Michigan courts also allow direct evidence, as well as circumstantial evidence under the *McDonnell Douglas* framework, in considering discrimination claims under the Elliot-Larsen Michigan Civil Rights Act, MICH. COMP. LAWS § 37.2101 *et seq. See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-521 (Mich. 2001).

finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor. *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2001). Isolated and ambiguous comments are insufficient to support a finding of direct discrimination. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005).

Umani has not alleged or produced any evidence that Wolfenbarger or Scott made any racist comments. Umani alleges that Ignasiak stated, "And we know about ARUS Wade. And we know how you people stick together." Although the magistrate judge interpreted Ignasiak's comment as meaning that Wade's findings were the product of his favoring members of his own race, that is not the only possible interpretation of this ambiguous comment. Ignasiak could also have been referring generally to the prisoners and staff in Umani's cell block. Ignasiak's use of the term "you people" does not qualify as a clear reference to race and is not direct evidence of discrimination. *See Scott v. Thomas & King, Inc.*, No. 3:09-CV-147, 2010 WL 2630166 at *7 (S.D. Ohio, June 28, 2010)(the term "you people" is not a racial epithet, and without additional actions or words, it is not direct evidence of discrimination); *Wilson v. Buschell*, No. 2:05-cv-106, 2007 WL 2780886 at *1, 3 (W.D. Mich. Sept. 20, 2007)(the statement "you people don't do what I do, stay in your place" made by a white supervisor to a black prisoner-employee was not in itself a racial statement). Without other allegations indicating a racist meaning, this ambiguous comment is not in and of itself racist.

Umani also alleges that when Green informed him that his employment might be terminated despite the "not guilty" finding, Green said, "Ya'll some worthless convicts. Some niggers that are insignificant in the scheme of things around here [sic]." The use of the word "niggers" is a racial slur "irrespective of its common usage and without regard for the race of those who use it." *NLRB v. Foundry Div. of Alcon Indus.*, 260 F.3d 631, 635 (6th Cir. 2001).[4]

Regardless of how the statement is construed, to qualify as direct evidence of discriminatory intent, it must have been made by a person with decision-making authority. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000)(racial comments made by persons who did not terminate plaintiff were not direct evidence of discriminatory intent); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)(statements by nondecisionmakers do not suffice to satisfy plaintiff's burden of demonstrating discriminatory animus; *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161-62 (6th Cir. 1992)(statements of intermediate level management officials were not indicative of discrimination when the ultimate decision to discharge is made by an upper-level official). The statements of those who do not have formal firing authority, but who have "enormous influence in the decision making process" can also constitute direct evidence of discrimination. *Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001).

---

[4]That case does not stand for the proposition that the use of the word "nigger" constitutes irrefutable direct evidence of discrimination in every case. It is arguable that the statement allegedly made by Green, an African-American, does not necessarily reflect a discriminatory animus on his part; rather, he could have been expressing his opinion about how other officials in the institution regarded inmates such as Umani.

The evidence below shows that only the Classification Director had authority to terminate an inmate's employment. Both Green and Ignasiak testified that although the Classification Director's decision may be influenced through recommendations or the submission of a Form 363 work evaluation, the Classifications Director is the only person with final authority to decide whether an inmate will be terminated from his prison employment. According to Wolfenbarger, a Form 363 could form the basis of the Classification Director's decision to terminate, but only if the Director agreed with the assessment. Plaintiff's Exhibit E, the Form 363 evaluation dated February 18, 2005, contains what purports to be Green's signature but is otherwise incomplete. The Form 363 relied on by the magistrate judge as evidence that defendants re-evaluated Umani is dated February 8, 2005, which was prior to the alleged meeting between the defendants to discuss the re-evaluation. There is no evidence that the Classification Director considered and was influenced by a Form 363 prepared by Green in deciding to terminate Umani's employment. Thus, Green's statement does not constitute direct evidence of discriminatory intent.

In the absence of direct evidence of discrimination, Umani must establish a prima facie case of discrimination in violation of his equal protection rights under the *McDonnell Douglas* analysis. *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 275 (6th Cir. 2003). He must show: (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class or was treated differently than similarly-situated members of the unprotected class. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007).

Umani is African-American and therefore a member of a protected class. There is also no question that Umani was terminated from his Food Services position and suffered lost wages as well as a blemish on his prison record. The defendants do not contest that he was qualified for the position; he received above average work evaluations and was capable of handling his job. However, there is no evidence that Umani was replaced by a non-African-American. In fact, defendants submitted evidence that the Food Service Department seeks to balance the number of African-American and Caucasian prisoner employees and to make sure the higher paying jobs are equally distributed between members of these races.

There is also no evidence that Umani was treated differently from similarly-situated members of another class. To be a similarly-situated employee, the comparative employee "must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Umani only alleges that he was not returned to his job after the "not guilty" finding, that this was a violation of prison policy, and that other prisoners were returned after "not guilty" findings. He alleged no facts to refute the defendants' evidence that while it is the general policy to return a prisoner to his employment upon a "not guilty" finding, that general policy may not apply given the individual circumstances of a particular case. There is no evidence, nor does Umani allege, that other non-African-American Food Service employees supervised by Shareef who were found "not guilty" of leaving their positions were automatically returned to their employment

12

with the Food Service regardless of extenuating circumstances. Therefore, Umani has failed to allege facts or to produce evidence sufficient to support this element of his prima facie case.

Because Umani has failed to produce direct evidence of discrimination or to allege facts showing that he was treated differently than other similarly-situated prisoners, he cannot establish a claim of race-based discrimination in violation of his equal protection rights under the Fourteenth Amendment. Defendants are entitled to qualified immunity on Umani's race-based equal protection claim.

**3. Class-of-One Claim**

The magistrate judge also analyzed Umani's claim under the theory that Umani was treated differently as a "class of one" without rational basis. Although recognizing that the "class-of-one" theory is generally not used in employment contexts due to the subjective nature of employment decisions, *see Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 594, 606-608 (2008)(holding that the "class-of-one" equal protection theory has no place in the public employment context), the magistrate judge nonetheless found that because Umani was not permitted to return to work upon a finding of "not guilty" in accordance with prison policy,[5] but instead was re-evaluated with the intent of causing his termination, there was sufficient evidence to overcome any presumption that the defendants' conduct was rational.

---

[5]To the extent that Umani's claim is based on a failure to follow prison policy, this is not a basis for a § 1983 claim. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007)(the failure to comply with an administrative rule or policy does not itself give rise to a constitutional violation).

13

To state a claim under the "class-of-one" theory, Umani must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Umani must show that he was similarly situated in all relevant respects. *See Ercegovich*, 154 F.3d at 352. He must also show that the adverse treatment he experienced was "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Warren v. City of Athens*, 411 F.3d 697, 710-11 (6th Cir. 2005)(quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000)). This showing is made either by negating every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will. *Id.* at 711.

In his complaint, Umani alleges that he and another African-American prisoner were both terminated from their employment after a finding of "not guilty" on the grounds that they had "violated the integrity of the kitchen," whereas other prisoners who had been fired for stealing were allowed to return to work. Even assuming that this allegation is true, it does not show that Umani was treated differently than similarly-situated prisoners, but instead establishes that he received the same treatment as another prisoner accused of violating the kitchen's integrity. There is no evidence to support Umani's argument that stealing is similar to "violating the integrity of the kitchen" in the overall scheme of prison security. In fact, Green testified that while stealing a hot dog, being late to work, and leaving an assignment are all "minor misconducts," leaving an assignment is the most serious of the three. There is no evidence that Umani was treated differently than similarly-situated

14

prisoners who were accused of violating kitchen integrity and found "not guilty" of minor misconduct.

There is also evidence that the decision to terminate Umani's employment in light of his conduct was related to the achievement of the legitimate purpose or goal of prison security. Defendants presented evidence that a prisoner must have permission from both the supervisor and kitchen officer to leave his work assignment and must check out with the kitchen officer before leaving. Even assuming that Shareef gave Umani permission to leave at some point, there is no evidence that Umani complied with the other requirements for leaving his post. Green testified that when a prisoner leaves his work assignment, it affects the operation of the kitchen and creates a security risk because staff cannot control the environment if they don't know where all prisoners are at all times. Ignasiak testified that the concern with Umani not obtaining the proper permission to leave was the risk created by having a prisoner's whereabouts unknown to staff and the potential for harm, either to that prisoner or to another prisoner, that could result from having a missing prisoner walking around the institution. The prison staff in this case had a legitimate interest from the standpoint of prison security in knowing where their prisoners are at all times, and their decision is entitled to deference. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplishing them."). Umani has failed to establish an equal protection violation under the class-of-one theory, and defendants are entitled to qualified immunity on the class-of-one equal protection claim.

15

## C. Conspiracy Claim

To state a claim for relief under § 1985(3), Umani must prove:

1) a conspiracy [between two or more persons]; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005)(internal quotation marks and citation omitted); *see also Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996). Umani must show some racial or other class-based invidiously discriminatory animus. *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998).

In order for Umani to defeat defendants' claim for qualified immunity, he must first establish that a constitutional right was violated. Since we have concluded that Umani has failed to allege facts or to provide evidence sufficient to establish that a race-based or class-of-one equal protection violation was committed by the defendants, his conspiracy claim under § 1985(3) also fails. *See Wiley v. Oberlin Police Dep't*, 330 F.App'x 524, 530 (6th Cir. 2009)(where plaintiff failed to show an underlying constitutional violation that injured her, plaintiff cannot prevail on her conspiracy claim); *Thompson v. City of Memphis*, 86 F. App'x 96, 103 (6th Cir. 2004) (where plaintiff failed to show that defendants discriminated against him or committed an equal protection violation, he also failed to prove a conspiracy claim under § 1985(3)); *cf. Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)(a civil conspiracy under § 1983 requires proof of an overt act in furtherance of the

conspiracy that caused injury to the plaintiff).[6]  Accordingly, the defendants are entitled to qualified immunity on Umani's conspiracy claim.

## IV.  Conclusion

In accordance with the foregoing, the decisions of the district court of July 13, 2009, and February 2, 2010, denying the April 23, 2009, motion for summary judgment filed by defendants Wolfenbarger, Scott, Ignaziak and Green are REVERSED, and the case is remanded with instructions to enter final judgment in favor of these defendants on all of Umani's claims.

---

[6]To the extent that Umani asserts a conspiracy claim under Michigan law, we reach the same result.  A claim for civil conspiracy may not exist in the absence of an actionable tort.  *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 402 N.W.2d 830, 836 (Mich. App. 1986); *see also Fenestra Inc. v. Gulf Am. Land Corp.*, 141 N.W.2d 36, 49 (Mich. 1966)(a conspiracy standing alone without the commission of acts causing damage is not actionable).