NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0271n.06

No. 10-1728

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 18, 2013*
DEBORAH S. HUNT, Clerk

BROOKE ELIZABETH HEIKE,                         )
                                                )
    Plaintiff-Appellant,                        )
                                                )
v.                                              )  ON APPEAL FROM THE
                                                )  UNITED STATES DISTRICT
SUE GUEVARA, individually and in her official   )  COURT FOR THE EASTERN
capacity, DAVE HEEKE, individually and in his   )  DISTRICT OF MICHIGAN
official capacity, PATRICIA PICKLER, individually )
and in her official capacity, and CENTRAL       )
MICHIGAN UNIVERSITY BOARD OF TRUSTEES,          )
a constitutional body corporate,                )
                                                )
    Defendants-Appellees.                       )

Before: BOGGS and WHITE, Circuit Judges; and BERTELSMAN, District Judge.[*]

PER CURIAM. Brooke Elizabeth Heike appeals a district-court decision dismissing her equal-protection, substantive-due-process, procedural-due-process, and state-law defamation claims against her former basketball coach, Sue Guevara, and a number of other Central Michigan University officials.[1] Her lawsuit raises the perhaps commonly contemplated, but seldom actually litigated, question: what legal recourse is available to an athlete who believes that her coach has

---

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] Heike raises only these four claims on appeal, though she pursued others below.

treated her unfairly? In this case, the answer is: none. The district court properly disposed of Heike's claims, and we affirm its decision.

I

Brooke Elizabeth Heike was a star basketball player at Romeo, Michigan's Romeo High School. She served as team co-captain, was named to all-league and all-conference teams, and earned honorable mention on Michigan's all-state team. A number of National Collegiate Athletic Association (NCAA) Division I schools recruited Heike to play on their women's basketball teams.

Ultimately, Heike committed to Central Michigan University. She accepted an athletic grant for the 2006–07 academic year, which comprised: "In-State Tuition/Fees, Room and Board, and Book Loan." The NCAA only allows institutions to grant athletic scholarships on a year-to-year basis. Thus, Heike's commitment letter expressly stated that the grant was subject to yearly renewal.

During recruitment, then-Head Women's Basketball Coach Eileen Kleinfelter told Heike: "I can't guarantee how much playing time you'll receive, but I can guarantee you an education." Heike's first season of Division I basketball bore out at least the first part of Coach Kleinfelter's statement. She received little playing time and grew frustrated. Nevertheless, Heike recognized that she "was a freshman and . . . needed to wait [her] turn." She felt that Coach Kleinfelter was "up front and very honest with [her] about that" and treated her fairly. Heike ultimately appeared in eleven games her freshman season. She played for an average of 5.4 minutes per game—the fewest

of anyone on the team, nearly by a factor of two—scored a team-low average of 1.5 points per game,[2] and had the lowest shooting percentage on the team.[3]

After the 2006–07 season, Coach Kleinfelter and her staff left Central Michigan University. The University replaced her with Coach Guevara and Assistant Coaches Bill Ferrara, Kathy McGee, and Ayesha Whitfield. Heike's first encounter with the new coaching staff was a meeting with Ferrara in the spring of 2007. During the meeting, Heike suggested that she deserved to play more than she had her freshman year. In response, Ferrara said: "You can transfer to Saginaw Valley [State University] if you're not happy."

Heike did not transfer and Central Michigan University renewed her scholarship. She signed a financial-aid form, which provided that her grant would not "be increased, reduced or canceled *during the period of its award* on the basis of . . . athletics ability, performance or contribution to [the] team's success . . . or for any other athletics reason." (emphasis added). The period of the award was the 2007–08 academic year.

Heike spent the summer of 2007 working with professional trainers to improve her basketball skills. During her sophomore year she played in only six games and scored only two points—both on free-throws. The only player to appear in fewer games or score fewer points was Freshman Beth Brown, who also lost her scholarship after the 2007–08 season. Heike believed that the coaching

---

[2] Heike's scoring average per minute played—perhaps a fairer metric—was second-lowest on the team, above only Kendra Holman.

[3] These statistics exclude Brittany Szunko, who played very little during the 2006–07 and 2007–08 seasons because of injury.

staff refused to give her or Brown as much playing time as the rest of the team because they "were too girly," and "happened to be white." She claimed that Coach Guevara criticized her for tanning, wearing tight pants, and wearing makeup. Heike also alleged that African-American players had more opportunities to play because "Sue Guevara . . . wanted a tough-looking, thug-looking team and that's what the African Americans displayed." "They [the African-American players] brought on this thug theme that they were thugs and they were this tough . . . [the African-American players wore] baggy boy's pants below their butt and wore shorts underneath, and wore men's boots and men's shoes, men's hats." Coach Guevara, Heike explained, repeatedly told her to "toughen up," even suggesting that she "get some [tattoos of] C's on her arm."

In December 2007, Coach Guevara kicked Heike out of practice and suggested that she "go back to her apartment and think about whether CMU [was] where she wanted to be." At the same time, Coach Guevara "also specifically told . . . Heike that she should think about going to another program where she would be happy, . . . reminded her that her scholarship at CMU was only for one year," and told her that, if she was unhappy, she should "take her scholarship and leave."[4] After this incident, Heike's morale declined, and she finished near the bottom of the team in a peer evaluation measuring team spirit.

At the end of the season, Guevara determined that "Ms. Heike did not adequately improve during the 2007/2008 season . . . [that she] lack[ed] the necessary athletic basketball skills to be competitive at the Division I level and that during the 2007/2008 season, she lacked the initiative

---

[4] Guevara denied making this statement.

and discipline for self improvement." Guevara, therefore, decided not to renew Heike's scholarship for the 2008–09 season. She informed Heike of her decision in a formal year-end evaluation meeting, where she said: "You can play basketball and you're an athlete but you'll never play here. You'll never play for me. You're not my type." Patricia Pickler, an assistant director in the Office of Scholarships and Financial Aid, sent Heike a letter, dated March 27, 2008, advising her of Guevara's decision, and explaining that she could appeal by requesting a hearing.

Heike submitted such a request on April 7, 2008, along with a written statement, which explained why she believed the decision not to renew her scholarship was unfair. She suggested that, over the course of the 2007–08 season, Guevara "was trying to get [her] to quit." Heike's statement suggested that Guevara had decided not to renew her scholarship because she wanted to develop a winning team quickly. Heike contended: "[Guevara] should have to go through the normal process and time period to build the 'type' of team she wants like any other [coach] . . . . To allow her to dispose of people without just cause in hopes to improve her team at a quicker pace is morally and ethically wrong."

On June 5, 2008, Pickler sent a letter advising Heike and Guvara that an appeals hearing had been set for June 11, 2008. The letter explained:

> The purpose of this appeal hearing is to determine if the action to not renew Ms. Heike's athletics aid for the 2008-2009 academic year was a substantial injustice. If the committee decides that it was more likely than not that Coach Guevara's decision was reasonable, it will uphold the decision. If it decides that it was more likely than not that her decision was unreasonable, it will ask that Ms. Heike's athletics aid be reinstated.

The letter also explained some of the procedures that would govern the hearing, and referred the parties to an attached copy of the University's policies for a more detailed explanation. In relevant part, the letter and written policies provided that Heike and Guevara would each be allowed to have one advisor present, could each present witnesses, could question the other's witnesses, and could make a closing statement. The appeals committee, composed of Pickler, Professor of Management Kevin Love, and Director of Career Services Julia Sherlock, would hear the parties' presentations, ask questions of witnesses, and decide whether to uphold Guevara's decision.

Also attached to Pickler's June 5 letter was Heike's written statement, and a written response from Coach Guevara, dated April 24, 2008. Guevara's response indicated that Heike did not have the skills necessary to compete at the Division I level. Guevara claimed that Heike "[m]issed box-outs . . . [d]id not grab rebounds . . . [l]acked physical play . . . [c]ould not defend post players . . . [m]issed lay-ups in drills . . . [and] missed sprint times causing the entire team to have additional sprints." Guevara further wrote: "While [Heike] is a gifted student and intelligent woman off the floor, she consistently struggles to understand key basketball concepts." She also believed that Heike "never appeared to strive for success," "seemed very satisfied with her deficiencies," and generally "lacked the initiative and discipline for self-improvement." Finally, Guevara claimed: "[Heike] never requested additional assistance and never committed to improving her skills."

The hearing took place, as planned, on June 11, 2008. Coach Guevara spoke first. She emphasized that Heike failed to perform well in practices or games, and did not make a concerted effort to improve. Heike then questioned Guevara on a range of topics, including her past coaching

history, her decisions about playing time, and her interactions with Heike during the 2007–08 season. Guevara adhered to the claims she made in her written response, except that she admitted Heike had sought help from the coaching staff.

Heike then had the opportunity to present "information as to why [she felt] the decision to not renew [her] scholarship should be changed and . . . to call in [her] witnesses." Heike attempted to refute Coach Guevara's claims about her abilities and work ethic, both through her own statements and by offering testimony from the trainers she worked with after the 2006–07 season, a former coach, and Beth Brown, another player who also had her scholarship revoked.

After the appeals committee questioned Assistant Coach Ferrara, both Heike and Guevara made closing statements. Guevara emphasized that, in her judgment, Heike lacked initiative. In her closing statement, Heike continued to suggest that Coach Guevara singled her out because she was not a tough enough basketball player. Heike made fleeting reference to race and sexual orientation, asking: "Is it because I'm white? All three of us [white players] are being replaced by four African Americans next year.[5] The question should be asked whether or not we're being discriminated against. . . . Is it because I'm a heterosexual? I don't know."[6]

---

[5] Guevara replaced Heike, Beth Brown, and the graduating seniors with four Black players and one White player.

[6] Heike later testified that she believed race played a central role in Guevara's decision not to renew her scholarship.

Pickler called Heike twenty minutes after the end of the hearing to inform her that the committee decided to uphold Coach Guevara's decision. On June 18, 2008, she mailed Heike a letter confirming the decision in writing.

Heike filed suit in February 2009 against Central Michigan University's Board of Trustees, Coach Guevara, Athletic Director Dave Heeke and Office of Scholarships and Financial Aid Assistant Director Patricia Pickler in the United States District Court for the Eastern District of Michigan. She claimed that Coach Guevara revoked her scholarship either because she was White, or because she was a heterosexual. Heike sought relief on nine counts:

> (1) violations of procedural and substantive due process pursuant to the Fourteenth Amendment to the U.S. Constitution, based on alleged flaws in the process used to determine that Plaintiff's athletic scholarship would not be renewed for the following year; (2) violations of the Equal Protection Clause to the U.S. Constitution based on allegations that the decision was made to not renew Plaintiff's athletic scholarship because of her race and status or identity as a heterosexual; (3) breach of contract or implied contract against CMU because Plaintiff's athletic scholarship was not renewed for the two additional years that it would take her to complete her college education; (4) defamation based on allegedly false statements that were made by individuals during the process of deciding not to renew Plaintiff's athletic scholarship that allegedly prevented Plaintiff from having her scholarship reinstated or receiving a scholarship from another school; (5) tortious interference with a contract or advantageous business relationship or expectancy against the individual Defendants for allegedly interfering with Plaintiff's relationship with CMU; (6) intentional infliction of emotional distress; (7) violations of certain provisions of the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, et seq., based on allegations of discrimination because of Plaintiff's "race and color," and "heterosexual preference"; (8) negligent hiring of Coach Guevara against CMU and AD Heeke based on the alleged lack of research into Coach Guevara's background; and (9) negligent supervision of Coach Guevara against CMU and AD Heeke based on Coach Guevara's conduct towards Plaintiff.

On September 2, 2009, the district court granted in part a motion to dismiss, filed by all defendants, and asked for additional briefing. It dismissed, as barred by sovereign immunity, all claims against the University and all official-capacity claims against Guevara, Heeke, and Pickler, except for the federal claims to the extent those claims sought prospective injunctive relief. After receiving supplemental briefing, the district court dismissed Heike's negligent-hiring and negligent-supervision claims against Heeke, and her defamation claims against Heeke and Pickler. The court further concluded that Guevara's allegedly defamatory statements were neither absolutely privileged nor non-actionable statements of opinion. It reasoned, however, that Heike had not pleaded the special damages required to sustain such a claim with sufficient specificity, and gave Heike leave to file an amended complaint. Heike filed such a complaint. Nevertheless, on February 9, 2010, the court granted Guevara's motion to dismiss Heike's defamation complaint, reasoning that Heike invited the allegedly defamatory statement by requesting an appeals-committee hearing.

Finally, on May 3, 2010, the district court granted Guevara, Heeke, and Pickler's motion for summary judgment as to Heike's federal claims. It first reasoned that Heike could not make out a race-discrimination claim, based on either direct or indirect evidence. Next, the court held that Heike's claims based on sexual preference failed because she did not show that Guevara treated her differently than other similarly situated players, without any rational basis. The court then addressed Heike's substantive-due-process claims, holding that those claims could not be maintained independent of her equal-protection claims. Finally, the court granted summary judgment on Heike's procedural-due-process claims. It assumed that Heike had a protected property interest in her

scholarship, but held that she had been given enough process to satisfy the Due Process Clause. The court declined to exercise supplemental jurisdiction over Heike's remaining state-law claims.

Heike filed this timely appeal, challenging the dismissal of her federal constitutional claims and her state-law defamation claim.

## II

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This court reviews the grant of a motion for summary judgment de novo. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). We must construe all evidence and draw all inferences against the moving party. *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). However, "the mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In this analysis, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## A

The Equal Protection Clause of the Fourteenth Amendment provides: "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The government, therefore, may not distinguish among

individuals in a way that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 788 (6th Cir. 2005). Heike claims that Appellees violated the last two of these prohibitions. We address her arguments in turn.

1

Heike's first claim is that Guevara declined to renew her scholarship because she is White. Before addressing the substance of this allegation, we must decide which legal framework applies. The district court used the familiar employment-discrimination rubric. Here, the parties have followed suit, briefing the issue as though it involved an adverse employment decision. Appellees, however, correctly note that collegiate athletic scholarships are not precise analogues of employment contracts, and that there is little directly applicable case law. Appellees' Br. at 29–30. From these premises, Appellees draw two conclusions. First, they suggest that it is not clear whether federal courts should entertain a claim like Heike's, which challenges a coach's personnel decisions, at all. Second, assuming that Heike's claim is cognizable in federal court, Appellees argue that Guevara should receive more deference than an ordinary employer charged with unconstitutional discrimination. College coaches, Appellees reason, face intense pressure to win, will try to build the most competitive team possible, and thus have a strong "incentive not to reject a player for arbitrary reasons." *Id.* at 29.

Of course, athletic scholarships are not employment contracts, and college coaches "live and die by their win/loss records." *Ibid.* But this does not mean that they should be immune from equal-

protection scrutiny. We do not suggest that courts may substitute themselves for collegiate athletics departments in making scholarship-renewal decisions, but it is not appropriate to allow college coaches to impose their own racial prejudices on college athletes. The familiar employment-discrimination framework, designed to account for the competing concerns of employer discretion and equal protection, strikes an appropriate balance. It gives the coach an opportunity to make legitimate personnel decisions without facing liability, while protecting student-athletes from race-based discrimination. In this analysis, it may be appropriate to give coaches somewhat more deference than ordinary employers. But any such leeway comes from the broad range of legitimate, nondiscriminatory reasons a coach may have for deciding who plays, how much they play, and whether they stay on the team from year to year, not any special *per-se* rule applicable to college coaches.

Under this familiar rubric, a plaintiff makes an equal-protection claim either by "present[ing] direct evidence of discrimination, or . . . [by] establish[ing] a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green.*" *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (per curiam) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)); *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).

"Direct evidence [of discrimination] is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Weberg*, 229 F.3d at 522. Such evidence might include "a facially discriminatory . . . policy or a

corporate decision maker's express statement of a desire to remove employees in the protected group." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Heike claims that Guevara's stated preference for "thug" or "ghetto" players and her comment that Heike was not her "type" are direct evidence of race-based discrimination. Appellant's Br. at 22–23. This claim relies on the assumption that only African-American players can be "thug" or "ghetto." To adopt this logic and hold that the words "thug" or "ghetto," without more, necessarily refer to African-American players would be to perpetuate the very race-based distinctions that the Equal Protection Clause prohibits.[7] "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). Heike does not present direct evidence of racial discrimination.

Heike may still maintain her claim if she produces indirect evidence of racial discrimination, using the *McDonnell Douglas* framework. *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 800 (6th Cir. 1998). To establish a prima facie case of discrimination, Heike must show that: (1) she is a member of a protected class; (2) she was qualified for a position; (3) she suffered an adverse

---

[7] Our sister circuits have applied similar reasoning, both in the employment context, *see Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348–49 (5th Cir. 2007) (holding that, without more, reference to working with "ghetto children" was not an unlawful employment practice, and employee's response was not protected activity within meaning of Title VII), and in the context of equal-protection challenges to legislative schemes, *United States v. Thurmond*, 7 F.3d 947, 953 n.6 (10th Cir. 1993) (holding that senator's use of word "ghetto" in Newsweek article, combined with statistics showing that most cocaine offenders were Black, did not compel conclusion that new cocaine penalty scheme was discriminatory).

decision affecting her position; and (4) the employee replacing her was not from the protected class, or the employer treated her differently than a similarly situated, but not protected, employee. *Arendale*, 519 F.3d at 603; *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 66–67 (6th Cir. 1985). Our precedent requires that, when a member of a majority group claims discrimination based on majority-group status, the first element of the *prima facie* case requires that the plaintiff "prove background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority. . . . [And] to satisfy the fourth prong, Plaintiff must show that the [defendant] treated differently similarly situated employees of a different race." *Ibid.* (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)) (internal quotation marks and alterations omitted).

If Heike makes this showing, Guevara bears the burden of "articulat[ing] some legitimate, nondiscriminatory reason for [Heike's] rejection." *McDonnell Douglas*, 411 U.S. at 802. If Guevara provides such a reason, Heike may still succeed by demonstrating that Guevara's proffered explanation is mere pretext. *Id.* at 804–05.

Heike does not carry her burden to establish a *prima facie* case of race discrimination, and even if she did, she would not be able to show that Guevara's asserted legitimate reasons for dismissing her from the team were mere pretext. First, Heike presented no evidence that Guevara was "that unusual employer who discriminates against the majority." *Arendale*, 519 F.3d at 603. The nearest she comes is citation to other players' statistics from Guevara's tenure at Central Michigan and elsewhere. But these statistics show only that other players—some Black and some

White—got more playing time than Heike, or remained on a Guevara-coached team, despite poor statistics. The numbers, without more, do not suggest that Guevara was inclined to discriminate against White players based on race.

But even if Heike did show that Guevara was inclined to discriminate against White players, she could not demonstrate that others who were similarly situated, but members of a different race, were treated more favorably than she was.[8] To be similarly situated, a player "must have dealt with the same [coach], have been subject to the same standards, and have engaged in the same conduct *without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.*" *Umani*, 432 F. App'x at 460 (emphasis added) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Under this standard, a player would be similarly situated to Heike if she played for Coach Guevara, was subject to the Coach's standards for athletic achievement, performed poorly from a statistical perspective, and displayed an attitude considerably worse than the majority of her teammates.

Heike offers no evidence that such a player exists, or, if she did, that the player was treated differently because of her race. Rather, Heike produces statistics from teams Guevara coached, which show that a number of players performed poorly from a statistical perspective, but retained

---

[8] Only the first and fourth elements are at issue here. Whether Heike was qualified to play Division I basketball is a question of fact that we must resolve in Heike's favor at the summary-judgment stage. *Martin*, 561 F.3d at 443. Unquestionably, she suffered an adverse decision when Guevara chose not to renew her scholarship. Thus, she meets the second and third elements of a *prima facie* case under the *McDonnell Douglas* analysis.

their scholarships. Appellant's Br. at 8–10, 26. Her attitude, she contends, is irrelevant—only objective statistical indicia matter. *Id.* at 28–29.

Heike is incorrect. This court has long held that individuals are not similarly situated if there are "differentiating or mitigating circumstances that would distinguish [individuals'] conduct or their employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). On a college basketball team, where motivation is at a premium, a lack of team spirit can sap others' enthusiasm, perhaps leading the team to perform below its potential. Such a negative effect on the unit as a whole is precisely the type of circumstance that justifies treating two otherwise-similar individuals differently. Thus, Heike's attitude is relevant to determining whether she was similarly situated to other players Guevara coached. Because Heike produces no evidence that she was treated differently than another player on a Guevara-coached team, subject to the same standard of athletic achievement, who produced poor statistics and displayed a negative attitude, she cannot establish that others who were similarly situated, but members of a different race, were treated more favorably. Heike, therefore, fails to establish a prima facie case of race-discrimination, and her first equal-protection claim fails.

Heike also alleges that Heeke violated her equal-protection rights through race discrimination. Heeke allowed men's basketball player Marcus Van to return to his team, even though Van's scholarship was revoked after he pleaded guilty to criminal charges. Heeke explained in a statement given to ESPN: "We feel this opportunity is warranted after an extended evaluation of this situation." Heike suggests that Heeke's failure to reinstate her scholarship was a violation

of the Equal Protection Clause. Appellant's Br. at 35 ("Thus, a male minority player's dismissal from the basketball team and the accompanying loss of his scholarship was overturned with the approval of defendant Heeke.").[9] In granting summary judgment on this claim, the district court correctly held that Heike and Van were not similarly situated. Unlike Heike, Van had his coach's support in his bid for reinstatement, *ibid.*, and the reasons the two players lost their scholarships were different: Van, unlike Heike, initially lost his scholarship for a reason wholly unrelated to his attitude and performance.

Heike contends that the district court erred because: "there is no evidence in the record that . . . the men's basketball coach . . . approached defendant Heeke regarding reinstatement." Appellant's Br. at 35. This claim misapprehends the district court, which reasoned, based on Heike's own submission, that the men's basketball coach had changed his position on whether Van should be a member of the team. Heeke and the men's basketball coach were aligned. Never did Guevara indicate that Heike's scholarship should be reinstated. To the contrary, she defended her decision to remove Heike from the team. As such, Van and Heike presented Heeke with fundamentally different decisions. They were not similarly situated student athletes.

---

[9] It appears that Heike's claim in this court is that Heeke "approved the reinstatement of . . . Van," while declining to do the same for Heike. Appellant's Br. at 34. The district court suggested that her claim against Heeke was slightly different. It wrote: "Plaintiff asserts that she was not afforded the same opportunity for an 'extended evaluation' [as Van] by AD Heeke." Neither version of Heike's claim is tenable for the reasons we articulate above.

2

Heike also claims that Guevara discriminated against her because she was heterosexual and looked "too girly." The parties agree that sexual orientation is not a suspect class. Heike's second equal-protection claim, therefore, could only proceed under a 'class-of-one' theory. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing class-of-one theory in property context).

Our analysis of this alleged constitutional violation ends before it begins. In *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that "the class-of-one theory of equal protection does not apply in the public employment context." 553 U.S. 591, 598 (2008). Engquist was an employee of the Oregon Department of Agriculture. *Id.* at 594. After a series of budget-cuts, she "was effectively laid off," *id.* at 595, and proceeded to sue the Department and two management-level employees, under a class-of-one theory. Although Engquist prevailed at trial, the Supreme Court held that her claim was not cognizable. It reasoned:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases, the rule that people should be treated alike under like circumstances and conditions is not violated when one person is treated differently from others because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603 (internal quotation marks omitted).

As we discuss below, Heike's scholarship is analogous to a one-year employment contract, renewable at will. *See infra*, Part B.2. This lawsuit hinges on the decision not to renew that contract

and thus is analogous to a state official's decision whether to retain an employee in an at-will context. Because *Engquist* holds that such decisions are not actionable under a class-of-one theory, it bars Heike's second equal-protection claim wholesale. *Engquist*, 553 U.S. 591.

Heike quite correctly points out that she "was not an at-will employee of CMU but a student-athlete." Appellant's Reply Br. at 19. However, a coach's decisions about who plays, how much playing-time each player gets, and whether a player remains part of the team at the end of a season are, by their nature, "based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603. These athlete evaluations are as or more inherently subjective than employment decisions. In making their determinations, coaches "simply . . . exercise the broad discretion that typically characterizes" the coach-player relationship. *Id.* at 605. To subject run-of-the-mill coaching decisions to class-of-one equal-protection challenges would be to expose collegiate athletics to an unprecedented, unjustified, and unjustifiable level of judicial oversight. *See id. at* 607 ("government offices could not function if every employment decision became a constitutional matter.") (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)). We decline to do so and, applying *Engquist*, hold that Heike's class-of-one claim must fail.[10]

B

The Due Process Clause of the Fourteenth Amendment provides: "No State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

---

[10] This holding is limited to class-of-one claims. As we explain above, the employment-discrimination framework properly applies when a plaintiff makes an equal-protection challenge based on membership in a protected class in the context of college sports.

This provision, the Supreme Court has held, contains a substantive component and a procedural component. Substantive Due Process protects individuals from government conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citation omitted).

Heike claims that Appellees violated her substantive-due-process rights by depriving her of her scholarship in an arbitrary and capricious manner. She claims that Appellees violated her procedural-due-process rights because they did not provide adequate procedural safeguards either before or after they decided not to renew her scholarship. For the reasons that follow, neither of Heike's claims is tenable.

1

Substantive due process bars the government from acting in a way that "shocks the conscience," *Rochin*, 342 U.S. at 172, or interferes with rights "implicit in the concept of ordered liberty." *Palko*, 302 U.S. at 325. No amount of procedural protection can excuse the government's violating this proscription. *See Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) ("Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures

used."). "As a general matter, [however,] the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). Accordingly, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation omitted).

Heike makes two types of constitutional claims in this case; explicit constitutional guarantees address both. First, she alleges that Guevara and Heeke wrongfully declined to renew her scholarship, based either on her race or on her gender. The Equal Protection Clause resolves this claim. Second, she alleges that Guevara, Heeke, and Pickler's decision not to renew her scholarship was "arbitrary and capricious and motivated by bad faith." The arbitrary and capricious action that Heike complains of is the decision not to renew her scholarship, based on reasons unrelated to performance (to wit, race and femininity), and the lack of sufficient procedural safeguards. The Equal Protection and Procedural Due Process Clauses resolve this issue. Heike's substantive-due-process claim, therefore, fails. *Albright*, 510 U.S. at 273.

2

"The right to procedural due process requires that when a State seeks to terminate a protected interest it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective." *Crump v. Lafler*, 657 F.3d 393, 397 (6th Cir. 2011) (internal

citations omitted). "To establish a violation of [her] procedural due process rights, [Heike] must show (1) that [she] was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law." *Pittman*, 640 F.3d at 729 (internal quotation omitted).

The first step in this analysis is to determine the precise nature of the interest at stake. "In order to have a protected interest, [Heike] clearly must have more than an abstract need or desire for it. [She] must have more than a unilateral expectation of it." *Crump*, 657 F.3d at 397. "Rather, a property interest exists and its boundaries are defined by rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bailey v. Floyd Cnty. Bd. of Educ. By and Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997). "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004). Here, the district court assumed that Heike had a property interest and addressed the adequacy of the process afforded her.

"The core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1988). In March 2008, Heike received notice from Pickler that her scholarship would not be renewed and that she could appeal by requesting a hearing in writing. After Heike requested a hearing, she received notice that an appeals hearing would be held on June 11, 2008, and a letter and additional information explaining the procedures that would govern that hearing. At the appeals hearing, Heike argued her case to the three-person panel,

presented testimony from trainers she had worked with and a fellow basketball-team member whose scholarship had not been renewed, cross-examined other witnesses, and made a closing statement.

The appeals hearing offered Heike procedural protection against an erroneous deprivation of any constitutionally protected property interest that she held in her athletic scholarship. We agree with the district court that Heike "did not advance evidence to suggest that the outcome of the appeals hearing was predetermined or that she did not have a fair opportunity to present her side of the story." Heike was afforded adequate pre-deprivation process, and summary judgment on her procedural due process claim was proper.

III

We turn now to Heike's state-law defamation claim, which the district court dismissed under Rule 12(b)(6). We review the grant of a motion to dismiss *de novo*. *Fed.-Mogul U.S. Asbestos Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 387 (6th Cir. 2011). In this analysis, "[a]ll well-pleaded facts in the complaint are accepted as true," *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009), and the court "construe[s] the complaint in the light most favorable to the non-moving party." *Fed.-Mogul*, 666 F.3d at 387. A complaint will survive a motion to dismiss only if it "contain[s] . . . enough facts to state a claim to relief that is plausible on its face." *Ibid.* (internal citations and quotation marks omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defamation, under Michigan law, consists of:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part

of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010). "Michigan courts have repeatedly recognized that a publication is absolutely privileged if the defamed party invited or consented to the publication. The privilege can be . . . express or implied. [And] an absolutely privileged communication is not subject to a defamation claim, even if the statement was false or malicious." *Romero v. Buhimschi*, 396 F. App'x 224, 236 (6th Cir. 2010) (internal citations omitted) (collecting cases).

Here, Pickler sent Heike a letter informing her that she was entitled to appeal. Attached to the letter were pages thirteen through sixteen of Central Michigan's 2007–08 Student-Athlete Handbook. Among other things, the handbook noted that Guevara would have an opportunity, in the course of the appeals hearing, to "present the reasons for the decision to deny the student-athlete his/her request." Central Michigan University Athletics Department, *Student-Athlete Handbook 2007–08* at 15, *available at*: http://www.cmuchippewas.com/View%20Article.dbml?& DB_OEM_ID=10500&ATCLID=1420737&SPID=4214&SPSID=46462 (last visited Aug. 17, 2011) (visit http://www.cumchppewas.com; search "student athlete handbook"). Heike requested an appeals hearing, and submitted her own written statement of the reasons she believed her scholarship should not be revoked, on April 7, 2008. In response, Guevara submitted a statement of her own, dated April 24, 2008.

Heike voluntarily took part in the appeals process, even though she knew that Guevara would have the opportunity to present the reasons she decided not to renew Heike's scholarship. In so doing,

Heike consented to Guevara's stating opinions about Heike to the appeals committee. The opinions that Guevara presented in her written response fall within the scope of this consent. Accordingly, the allegedly defamatory statements are absolutely privileged.

Heike resists this conclusion by arguing that she consented to Guevara's making statements at the June 11, 2008 appeals hearing, but did not consent to the statements in Guevara's April 24, 2008 letter. Appellant's Br. at 55. Further, Heike points out that Guevara qualified or recanted some of the statements in the letter, when questioned during the hearing, *id.* at 56, and claims: "By requesting a hearing at which defendant Guevara would appear, plaintiff did not invite defamatory statements—since those defamatory statements were not made at the hearing—but rather, plaintiff was able to show that defendant Guevara's previous statements about her were untrue and defamatory." *Id.* at 58.

Heike, however, consented to Central Michigan's appeals process, and submitted her own written statement. It was not until she did so that Guevara responded. As such, Heike invited the statements she now avers were defamatory. There is no allegation that the statements were published outside the appeals process. Her defamation claim must fail.

IV

Any athlete who has been cut from a team can sympathize with Heike. But disappointment and frustration with a coach's conduct do not, without more, entitle a player to legal relief. Because none of the claims Heike raises on appeal are tenable, we AFFIRM the judgment of the district court.