**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0601n.06

Case No. 17-1085

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TERRY REEDY, | ) | **FILED**<br>Nov 01, 2017<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| RICH TRANSPORT, LLC, et al., | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SILER, SUTTON, and WHITE, Circuit Judges.

**SILER**, Circuit Judge. Terry Reedy appeals from the district court's grant of partial summary judgment to Rich Transport, LLC; Rich Logistics, LLC; and Rich Logistics Holdings, LLC ("Rich"), in which the district court concluded that Rich did not unlawfully discriminate or retaliate against Reedy. Reedy asserts that partial summary judgment is not appropriate because the district court erred in making credibility determinations when record evidence establishes triable claims. We affirm because no genuine dispute of material fact exists that Rich is entitled to judgment as a matter of law.

I

Rich operates a trucking company, and Reedy worked for the company as a driver from October 2014 to February 2015.[1] Reedy worked from Monday to Thursday from 2:00 a.m. to 2:00 p.m.; his route covered four stops, beginning in Michigan and ending in Indiana, before

---

[1]We recite the record evidence in favor of Reedy in accordance with the summary-judgment standard. *See* Fed. R. Civ. P. 56(a).

returning home. Though his schedule operated from Monday to Thursday, Reedy had worked Fridays upon Rich's request. During his first month, Reedy received a speeding ticket while driving the route. Around December, Reedy's wife moved out of their home, leaving him responsible for the care of their five children (then ages 6, 8, 8, 11, and 15). Although no longer cohabitating, Reedy remained married at all relevant times. The facts of the lawsuit span six days: January 27 through February 2.

On Tuesday, January 27, Reedy slipped on a patch of ice while disconnecting the trailer from his truck. After Reedy informed Rich's terminal manager of lower-back pain stemming from the fall, the terminal manager instructed Reedy to contact Rich's day dispatcher, the person whom Reedy considered his supervisor. Reedy reported the injury to the dispatcher and discussed his need for medical attention. The dispatcher informed Reedy that Rich would cover expenses for injuries immediately reported and documented on an incident form. When Reedy represented that he had not received a form, the dispatcher responded, "[W]ell, we'll get it next time."

That same day, the dispatcher reported the incident to Rich's director of safety, whose responsibilities involved—among other things—approving all hiring, scheduling random drug tests, and meeting with injured drivers. Although the safety director informed the dispatcher of Reedy's obligation to fill out an incident form as a condition precedent to receiving worker's compensation, the safety director later admitted, "I dropped the ball on [not following up with Reedy's injury]. . . . I was covered up with other things and it got mishandled and that was my problem." Reedy did not document the injury and continued work unabated.

Two days later, on Thursday, Reedy informed Rich's night dispatcher that he had left his truck at or near a truck stop because he believed that snowy conditions made the roads too

dangerous for travel. When Reedy returned home, he relieved his regularly scheduled babysitter and resumed care for his children. The night dispatcher left a note about Reedy's actions, which the day dispatcher received around 10:00 a.m. at the beginning of his shift. The day dispatcher called Reedy, directing him to retrieve the truck and continue the route. When Reedy reported that he could not find another babysitter, the dispatcher responded, "I don't give a f**k about your kids. Get your f**king ass in that truck because that's where we need to have you." Reedy objected: "I can't leave my kids. You going to let me take my kids with me?" No dispute exists that the dispatcher, whom Reedy perceived to be his supervisor, knew that Reedy cared for five children at all times relevant. Around 11:00 a.m., the safety director called Reedy and inquired about whether he was a single parent. After affirmation, the safety director stated that he would not have hired Reedy had he known about his status as a single parent.

That same day, the dispatcher sent another driver to detach the trailer from Reedy's truck and deliver the rest of the load. Around that time, the news reported a blizzard and 100-car pile-up in the area. Another of Rich's drivers at some point informed the dispatcher that travel on the roads was slow due to snow. The dispatcher generally deferred to drivers on road-safety decisions, and he testified after the fact that Reedy acted reasonably given the conditions. Still all parties concede that Reedy disobeyed the dispatcher's order when he declined to retrieve the truck and trailer. Rich's articulated concern for retrieving the property—beyond fulfilling its delivery obligations—was threat of towing and consonant financial consequences.

On Friday, the beginning of his regularly scheduled time off, Reedy informed the day dispatcher that he could not retrieve the truck because he considered the roads unsafe and could not find a babysitter. The dispatcher reported to the safety director that Reedy had voluntarily quit because he refused to retrieve the truck and would not report to work. The dispatcher

admitted that Reedy never said he was quitting, but his failure to report to work suggested as much. The dispatcher testified that he understood why Reedy was unable to retrieve the truck: "I didn't make an issue about him not being available on Friday. I knew he had to make arrangements." On Sunday through another driver, Reedy learned that he had been placed on medical leave. He also learned that Rich would be picking up the truck and trailer.

On Monday, Reedy called the safety director to inquire about his employment status, and the safety director informed Reedy that he had been fired. The evidence shows that Rich justified termination on grounds that Reedy voluntarily quit and had performance issues.

In 2015, Reedy sued in state court, alleging violations under three provisions of the Michigan Complied Laws: (1) discrimination under the Elliot-Larsen Civil Rights Act ("Elliot-Larsen") on the basis of marital status; (2) retaliation under the Worker's Disability Compensation Act ("WDCA") on the basis of reporting a workplace injury; and (3) violations under the Bullard-Plawecki Employee Right-to-Know Act ("Bullard-Plawecki") on the basis of failing to receive his employment records. Rich removed the case on diversity grounds and moved for partial summary judgment on the discrimination and retaliation claims.

The district court granted partial summary judgment, concluding that Reedy failed to proffer evidence demonstrating pretext of discrimination and either pretext of or causation from retaliation. *Reedy v. Rich Transp., LLC*, No. 15-11401, 2016 U.S. Dist. LEXIS 113302, at \*16, 19–20 (E.D. Mich. Aug. 24, 2016). Upon settlement of the Bullard-Plawecki claim, the district court dismissed all claims without prejudice. Reedy appeals from the dismissal of the discrimination and retaliation claims.[2]

---

[2]The parties represented at oral argument that the two claims subject to this appeal were never settled and remain subject to appellate review. We agree because all claims were resolved below and Reedy raises appealable issues as to two of them. *See Zayed v. United States*,

II

We review de novo a district court's grant of partial summary judgment. *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 797 (6th Cir. 2012). Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The salient inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

III

Reedy asserts that partial summary judgment is not appropriate because disputed facts call into question the credibility of Rich's witnesses and establish triable claims. Reedy first argues that Rich discriminated against him by terminating employment after learning of his status as a single parent (even though he was married). Reedy further asserts that Rich retaliated against him for reporting a workplace injury. Reedy maintains that he took reasonable precautions on snowy roads for which he should not have been punished.

A

Reedy asserts that his discrimination claim withstands summary judgment because the evidence shows that Rich would not have hired Reedy upon knowledge or perception of his status as a single parent. Reedy stresses that direct evidence supports this contention without need for inferring animus. Reedy impugns the notion that his status as separated while married disqualifies protection under Elliot-Larsen, asserting that he qualifies for protected status because Rich perceived him as a single parent—whether married or not. Reedy argues in the alternative

368 F.3d 902, 904–05 (6th Cir. 2004) (concluding that the exercise of jurisdiction was proper because "[a]lthough the petition was dismissed without prejudice, the dismissal clearly terminated the action; Ms. Zayed could not cure the defect by amendment").

that circumstantial evidence precludes summary judgment because the statements by the safety director and dispatcher indirectly show discrimination. While highlighting that the district court found prima facie evidence of discrimination, he faults the analysis on pretext for giving undue weight to Rich's proffered reasons for termination. He explains that he suffered discrimination after the safety director learned about his marital status. Reedy argues that Rich vacillated on its reasons for termination, noting that only one speeding ticket cannot suffice as deficient performance. He inveighs against rationalizing termination on abandonment of the truck because Rich knew that Reedy had Friday off; that he was caring for his children; that the blizzard had progressed; and that the route eventually closed. Between shifting justifications and outstanding factual disputes, Reedy contends that Rich's proffered reasons for termination are dubious and inappropriate for summary judgment.

Reedy cannot adduce either direct or indirect evidence of discrimination under Elliot-Larsen on the basis of marital status. The Supreme Court of Michigan has never addressed whether protection for "marital status" under Elliot-Larsen covers single or separated parents (or the perception of single with children while still married). We assume without deciding that Reedy qualifies for protected status under Elliot-Larsen.

Elliot-Larsen prescribes that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment . . . because of . . . marital status." Mich. Comp. Laws § 37.2202(1)(a). While the term "marital status" is not defined in the statute, the Supreme Court of Michigan has defined the term as "whether a person is married." *Veenstra v. Washtenaw Country Club*, 645 N.W.2d 643, 646 (Mich. 2002) (citation omitted). A plaintiff suing under Elliot-Larsen may support claims "by introducing direct evidence of discrimination or by [presenting] circumstantial evidence [that]

would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). The "ultimate factual inquiry" is "whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (Mich. 2001).

i

Reedy fails to proffer direct evidence of discrimination on the basis of marital status. The Supreme Court of Michigan has endorsed our definition of direct evidence under concordant federal law. *See id.* at 520. Direct evidence "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski v. Blue Cross & Blue Shield*, 666 N.W.2d 186, 192 (Mich. 2003) (internal quotation marks and citation omitted). "If discriminatory statements are offered as direct evidence of discrimination, those statements 'must come from [the] decisionmakers' responsible for the adverse employment decision." *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 703 (6th Cir. 2016) (citation omitted). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus." *Id.* (internal quotation marks and citation omitted).

The two statements on which Reedy relies for direct evidence attenuate from the decision to end his employment. Reedy asserts that the safety director, as a decisionmaker, demonstrated animus by representing that Rich would have never hired Reedy to drive trucks had the company known about his concurrent obligations as a single parent. Still Reedy fails to show how this statement relates to the decision to fire him. The comment was about hiring practices, and no evidence connects that remark to a decision about firing. Reedy fails to create a genuine dispute of material fact that the safety director acted attendant to that statement or that that statement

bore directly on an unlawful practice of favoring singles or cohabiting married individuals over separated persons (perceived as such or otherwise). The dispatcher's statement directing Reedy to retrieve the truck notwithstanding his children likewise does not compel a conclusion that a disputed fact exits about whether the statement was motivated in part by animus. Without additional evidence, that statement on its face demonstrates concern about completing the route and retrieving Rich's property—not about the limitations of a disfavored status. Reedy moreover fails to provide evidence that the dispatcher was implicated in any decision about hiring or firing. Both statements, at bottom, bespeak concerns about Reedy's willingness to perform job functions, requiring an undisputed inferential leap to conclude Rich acted with animus. *See, e.g.*, *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("Deriving this purported desire from Newman's comment requires the inferential step of concluding that because Newman held this belief, he would want to have Johnson's employment terminated."); *Heike v. Guevara*, 519 F. App'x 911, 919 (6th Cir. 2013) (rejecting evidence as "direct" when it requires the assumption "that only African-American players can be 'thug' or 'ghetto'").

ii

Reedy also fails to create a genuine dispute of material fact of discrimination through circumstantial evidence. *See Sanders v. Jones*, 845 F.3d 721, 731 (6th Cir. 2017) (approving affirmance "on any basis supported by the record" (citation omitted)). Courts apply the burden-shifting framework set forth in *McDonnell Douglas* for a claim predicated on circumstantial evidence. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (applying Elliot-Larsen and citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *see also Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002) (noting that Elliot-Larsen cases based on circumstantial evidence follow "the same *McDonnell-Douglas* burden-shifting framework

used in federal discrimination cases" (internal footnote omitted)). *McDonnell Douglas* requires a plaintiff to establish a prima facie case of discrimination, which upon satisfaction shifts the burden to the employer to articulate a legitimate, non-discriminatory reason for the adverse decision, which upon satisfaction requires the plaintiff to show pretext. *See Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914–15 (6th Cir. 2013) (citation omitted).

A plaintiff establishes a prima facie case of discrimination under Elliot-Larsen by showing he (1) is a member of a protected class; (2) suffered an adverse employment; (3) was qualified for the position; and (4) lost the job to another under circumstances giving rise to an inference of unlawful discrimination. *Hazle*, 628 N.W.2d at 523 (incorporating analysis from analogous federal law); *see also Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). An inference of unlawful discrimination arises when the plaintiff is "replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." *Laster*, 746 F.3d at 727.

After establishing prima facie evidence of discrimination, the burden shifts to the employer "to offer a legitimate, non-discriminatory reason for the adverse employment action at issue." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). Should the employer carry its burden, the plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). An employer dispels pretext by establishing a "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). The "key inquiry is whether the employer made a

reasonably informed and considered decision before taking an adverse employment action." *Id.* at 807.

Reedy fails to adduce inferential evidence that Rich treated him differently on the basis of martial status. Rich notes that no evidence exists of similarly-situated employees outside the protected class enjoying better treatment, and Reedy tellingly fails to respond. In fact, upon review of the entire record, Reedy never once attempts to point to someone outside his class who replaced him or was affected differently by conduct attributed to Rich. *See Hein v. All Am. Plywood Co.*, 232 F.3d 482, 490 (6th Cir. 2000) (applying Elliot-Larsen and noting that "[n]o evidence in the record shows that Hein's replacement weighed less than Hein, or that Hein was treated differently than similarly-situated drivers from outside the protected class").

Even if Reedy could make out a prima facie case of discrimination, the evidence viewed in the light most favorable to him cannot establish pretext for discrimination. Rich made an adverse decision on legitimate grounds because Reedy refused to follow an order directing the retrieval of his truck, further exacerbated by Reedy's traffic citation in his first month on the job. The record establishes that Reedy was the only driver to refuse to work during that time. *See, e.g.*, *id.* ("Rather, Hein was the only driver who ever flatly refused to make a requested run under circumstances where it could have been safely done with reasonable diligence on his part."). Contrary to the characterizations of Reedy, the evidence does not suggest that Rich vacillated on or changed its reasons for termination. At all times the reasons for termination implicated the failure to retrieve Rich's property. And no genuine dispute of material fact exists that Rich had a proper and sufficient basis to fire Reedy after he refused performance when all others continued to drive. *See, e.g.*, *id.* ("Furthermore, as stated earlier, even assuming that Hein could establish a prima facie case, he failed to rebut the proffered nondiscriminatory explanation that Hein was

fired for refusing to make the July 8, 1997 delivery."). Total reliance on statements about Reedy's status as a single parent is not sufficient evidence of motivation to terminate his employment. Although close in time to termination, that stray statement is not linked to any adverse decision. Viewing the evidence in the light most favorable to Reedy, nothing in the record displaces Rich's reasonable desire to retrieve the truck, complete the route, and rectify the situation based on legitimate business needs.

B

Reedy argues that circumstantial evidence exists to support his retaliation claim. He posits that after informing Rich of his back injury on January 27, he was ordered to take a drug test and fired five days later. He observes that Rich reported ten drivers as injured on the job in 2015, and Reedy was not one of them. We disagree because Reedy cannot establish a causal connection between any adverse action and his back injury.

Worker's compensation seeks to "promptly deliver benefits to employees injured in the scope of their employment." *Dunbar v Mental Health Dep't*, 495 N.W.2d 152, 155 (Mich. 1992). Employers cannot "discharge . . . or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself . . . of a right afforded by this act." Mich. Comp. Laws § 418.301(13). A prima facie case of WDCA retaliation requires the following:

> (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right . . . were causally connected.

*Cuddington v. United Health Servs., Inc.*, 826 N.W.2d 519, 525 (Mich. Ct. App. 2012) (citation omitted).[3] Causation is "something more than merely a coincidence in time between protected activity and adverse employment action." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003).

Reedy does not argue that direct evidence exists to support his worker's compensation claim, and circumstantial evidence does not establish a connection between his injury and an adverse action. The record is devoid of evidence demonstrating animus against an employee with a potential workplace-injury claim. Although Rich conceded that the injury could have been handled better, nothing in the record suggests that Rich believed the back injury would subject the company to undesired exposure or preclude Reedy from performing his job. That Reedy continued to work without complaint undermines the implication that the injury caused an adverse employment action. Reedy does not dispute that he was subject to random drug tests and that Rich acted in a manner consistent with laws and regulations whose purpose is to ensure public safety. *See Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 359 (6th Cir. 2014) (noting for WDCA claims that "temporal connection coupled with merely the plaintiffs' subjective belief regarding retaliation does not constitute sufficient evidence of causation"). Reedy fails to pinpoint how the reporting of a back injury affected any decision by Rich.

**AFFIRMED**.

---

[3]Although the Supreme Court of Michigan has not addressed the proper standard for WDCA retaliation claims, we have endorsed these elements in other areas of civil-rights litigation. *See Polk v Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989). The parties have been consistent in advocating *Cuddington* as the correct approach.

Case No. 17-1085, *Reedy v. Rich Transport, LLC, et al.*

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I agree with my colleagues that Reedy's Worker's Disability Compensation Act claim was properly dismissed. Regarding the marital-status discrimination claim, however, I conclude that Reedy established a prima facie circumstantial-evidence case and presented sufficient evidence of pretext to survive summary judgment.

**I.**

The facts viewed in the light most favorable to Reedy are that around 2:00 a.m. on Thursday, January 29, 2015, while driving to his second stop, Reedy called night dispatch to report that there were whiteout conditions due to heavy snowfall and that the roads were bad. Night dispatch told Reedy to be careful, at which point Reedy's truck went into a 360 degree turn. After Reedy reported that his truck had spun, night dispatch responded, "get to a safe place and go home." PID 366/Reedy dep. Reedy found a truck stop at which to legally park the truck and called a friend to pick him up. Reedy testified that he called night dispatch with the location of his truck around 6:00 a.m. When he got home at around 6:00 or 7:00 a.m., he let his babysitter go home. Because schools were closed due to bad weather Reedy's five children stayed home that day. PID 366/Reedy dep.

Night dispatch left a note for day-dispatcher and driver-manager Oliver Arce saying that Reedy had parked his truck at a truck stop due to bad weather. Arce started work at 6:00 a.m. (central time, being located in Arkansas) PID 389, 392/Arce dep. Reedy testified that Arce called Reedy at 10:00 a.m. (eastern time) and told him to retrieve his truck and continue his route. Reedy testified that when he told Arce that he could not find another babysitter, Arce responded, "I don't give a f**k about your kids. Get your f**king ass in that truck because that's where we need to have you." Reedy replied, "I can't leave my kids. You going to let me

take my kids with me?" PID 366-67/Reedy dep. Reedy testified that Arce hung up on him; Arce denied hanging up on Reedy. PID 391/Arce dep.

Reedy testified that at about 11:00 a.m. (eastern time) the same day, safety director Sam Lister called him and inquired whether he was a single parent. Reedy said he was, and Lister responded that he would not have hired Reedy had he known he was a single parent. PID 363, 365 (clarifying that Lister called him on the morning of January 29)/Reedy dep. Lister denied making any such comment.

Dispatcher Arce testified that he called Reedy on the 29th

to set up arrangements because we organized another driver to go there and pick up his partially loaded trailer and bring him an empty trailer for his upcoming run. I had to get ahold of him so he could go down and disconnect the truck from the trailer so the other driver could pick it up.

PID 390/Arce dep. Arce testified that he spoke to Reedy again that day and learned that Reedy

drove down with his children, disconnected the truck from the trailer. The other driver picked up the trailer. Terry was supposed to connect to the empty, and because he had his children, I let him know that he wasn't able to drive the truck back at that time because company policy is you don't allow more than one passenger above the age of 12 and he couldn't drive the truck back with his kids. He drove his personal vehicle back home and was supposed to make arrangements to pick the truck and trailer up.

PID 390/Arce dep.[1]

On Friday, January 30, the beginning of Reedy's regularly scheduled time off, the snowstorm was ongoing, and Reedy informed dispatcher Arce that he could not retrieve the truck because he could not find a babysitter and the roads were unsafe.

Dispatcher Arce testified that he did not work on Saturday, January 31 or Sunday, February 1. Reedy testified that he next heard from Rich Transport around 9:00 p.m. on Sunday,

---

[1]Reedy was not asked at deposition about meeting the other truck driver at the truck stop to disconnect the trailer from his truck.

February 1, when a driver named Mike, whom Reedy had never met, called Reedy and said he was coming to get Reedy's truck and trailer. Reedy testified that Mike "said I was on medical leave . . . . He said he was told by the company to come get my truck because I was on medical leave." PID 143, 154/Reedy dep.[2]

Reedy testified that he called night dispatch that evening, Sunday, February 1, and the night dispatcher he spoke to could not explain why Mike was being sent to pick up Reedy's trailer. PID 156/Reedy dep.

On the morning of Monday, February 2, Reedy called safety director Lister and said, "Sam, Mike told me yesterday he wants to come get my truck. I didn't know I was on medical leave . . . Where does that leave me?" Lister responded "we're letting you go." PID 154-55.

## II.

I disagree with the majority's determination that Rich presented insufficient circumstantial evidence of discrimination to survive summary judgment.

Rich Transport terminated Reedy's employment within one to three days after dispatcher Arce yelled at Reedy, "I don't give a f**k about your kids. Get your f**king ass in that truck because that's where we need to have you," despite Reedy's explanation that he was unable to find a babysitter and the blizzard conditions made it too dangerous to drive, and after safety director Lister told Reedy that he would not have been hired had Lister known he was a single parent. These are certainly "circumstances giving rise to an inference of unlawful discrimination." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001) (applying the burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973): a

---

[2]No hearsay objection was placed on the record to Mike's statements.

plaintiff establishes a prima facie case of discrimination by showing he is a member of a protected class, suffered an adverse employment action, was qualified for the position, and lost the job to another "under circumstances giving rise to an inference of unlawful discrimination.")

Rich Transport articulated a legitimate, non-discriminatory reason for terminating Reedy's employment, that Reedy abandoned his job.[3] The burden thus shifted to Reedy to demonstrate that the articulated reason was merely a pretext for unlawful discrimination, by showing either that the reason had no basis in fact, was not the actual reason for his termination, or was insufficient to justify his termination. *See Campbell v. Human Servs. Dep't*, 780 N.W.2d 586, 594 (Mich. Ct. App. 2009).

Rich Transport has not explained who decided to terminate Reedy's employment or when that determination was made. Dispatcher Arce testified that he had no involvement in Reedy's termination, PID 394/Arce dep., but safety director Lister testified that dispatcher Arce told him that Reedy had voluntarily quit by refusing to retrieve the truck. PID 420. Human Resources manager Charlotte Jones, who works out of Little Rock, Arkansas, testified that she had no involvement in terminating Reedy's employment, had never discussed Reedy's job performance with dispatcher Arce, and could not recall if she had discussed Reedy's termination with safety director Lister. PID 507, 508, 510/Jones dep. Yet when asked why Rich no longer employs Reedy, Jones responded, "It was a self termination . . . that means you're terminating your employment for not showing up to work." PID 508/Jones dep. Jones pointed to the employee handbook provision that states, "one absent without proper notification is considered abandonment of position and is considered a voluntary termination without notice." PID

_____

[3]Reedy did not concede that he "disobeyed the dispatcher's order when he declined to retrieve the truck and trailer." *See* Maj. Op. at 3.

509/Jones dep. When asked whether she was aware that Reedy **had** notified dispatch when he left his truck at a truck stop due to weather conditions, she answered, "No, he didn't notify them when he left." Nonetheless, Jones admitted that if a driver leaves his truck and notifies dispatch, that would not be grounds for termination. PID 507/Jones dep.

Viewing the facts in the light most favorable to Reedy, he did not abandon his job or refuse "to follow an order directing the retrieval of his truck." Maj. Op. at 10. Reedy was not scheduled to work on Friday, January 30, Saturday, January 31, or Sunday, February 1. After receiving a call from the truck driver named Mike at 9:00 p.m. on Sunday, February 1, Reedy called Rich Transport and spoke to night dispatch, the only personnel available at that hour. Night dispatch could not explain to Reedy why Mike had been asked to pick up Reedy's trailer or whether it was true that Reedy was on medical leave. Dispatcher Arce, with whom Reedy usually communicated, did not work on Saturday, January 31, or Sunday, February 1.

On Monday morning, February 2, Reedy called Rich Transport and spoke to safety director Lister. Rich Transport's counsel did not ask Reedy at deposition what time he called and spoke to Lister on that Monday morning. In any event, Reedy testified that Lister told him in that phone conversation that his employment had been terminated.

Given dispatcher Arce's testimony that it was understandable that Reedy did not retrieve the truck on Friday, January 30 due to weather conditions, that Reedy's route was closed on Friday due to weather conditions, that the route did not run Saturday or Sunday, PID 391/Arce dep., and Human Resources manager Jones's testimony that if Reedy notified dispatch that he left his truck at a truck stop that would not be grounds for termination, a reasonable jury could easily conclude that neither "job abandonment" or refusal to pick up the truck was the real reason for the termination of Reedy's employment, particularly given the termination's close temporal

proximity to Arce's comments to Reedy about Reedy's children and Lister's comment that Reedy would not have been hired had Lister known that he was a single parent.

Reedy presented sufficient evidence of pretext to survive summary judgment.